O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

| | |
|---|---|
| JESSE BROWDER, et al., | Case No. ED CV 07-01180 SGL |
| Plaintiffs, | ORDER GRANTING CLASS CERTIFICATION |
| v. | |
| FLEETWOOD ENTERPRISES, INC., | |
| Defendant. | |

This matter is before the Court on plaintiffs' motion for class certification.  As set forth herein, the Court **GRANTS** plaintiffs' motion.

## I. Factual Allegations

The individually-named plaintiffs in this matter --- Jesse Browder, Mary White, Otha Townsend, Vera and Robert Burns, Tamicca Stantley, and Mary Goodwin --- are all residents of Alabama and are all purchasers of Fleetwood-manufactured homes.  (Mot. at 1).  The homes in question are "manufactured" in plants across the country (of which presently there are 20, but there have been as many as 45 plants since January 1, 1999) and are then delivered to a retailer, generally in two halves.  When purchased by the ultimate consumer, the two halves are taken to the consumer's property and joined together.  (Opp. at 2).

1    Plaintiffs allege that the defendant in this action, Fleetwood Enterprises, Inc. (herein

2    referred to as "Fleetwood"), the corporate parent of the companies that built their homes,

3    "from its base of operations in California, controls the entire insulation process for its

4    manufactured homes." (Mot. at 3). As part of this control, Fleetwood instructs its

5    manufacturing subsidiaries from whom to acquire insulation and negotiates those

6    contracts, acquires standard charts from the manufacturer of the insulation detailing the

7    depth or thickness to which blown insulation must be installed in the roof cavity to achieve

8    a particular R-Value (a measure of resistance to heat flow), and supplies these charts to all

9    of its subsidiaries. (Mot. at 3). Fleetwood also "'encourages' its manufacturing facilities to

10   follow a 'best practices' guide when installing insulation, supplies these facilities with

11   uniform instructions for installing insulation through an Intranet system maintained by

12   Fleetwood, monitors and audits compliance, instructs its facilities who to buy insulation

13   from, and even assumes responsibility for paying [the maker of the insulation] on a

14   monthly basis for the insulation ordered by its manufacturing facilities." (Mot. at 3-4)

15   (citations omitted).

16   For the homes in question, Fleetwood purchased the insulation from Green Fiber,

17   an unrelated manufacturer of insulation.

18   Plaintiffs further allege that regulations promulgated by the Federal Trade

19   Commission ("FTC") require home manufacturers to disclose the type, thickness, and R-

20   Value of insulation installed in their homes. (Mot. at 3). Plaintiffs argue that Fleetwood

21   uniformly directed and instructed its manufacturing subsidiaries to install blown insulation

22   and to calculate R-Values using flawed methods that are barred by FTC regulations. (Mot.

23   at 2). As a result, "Fleetwood's representations to [homeowners] were uniformly incorrect

24   and violated the relevant federal regulations requiring disclosure of R-Values." (Mot. at 2).

25   In essence, plaintiffs allege that Fleetwood is responsible for a defective method for

26

27

2

1  installing insulation that was applied uniformly through its manufacturing subsidiaries.

2  (Mot. at 2).

3         Specifically, plaintiffs allege that Fleetwood instructed its manufacturing subsidiaries

4  to install insulation with a standard deviation of two inches from the minimum required

5  depth or thickness necessary to achieve the represented R-Value so long as the average

6  overall thickness of the insulation equaled the minimum thickness necessary to achieve

7  the represented R-Value.  (Mot. at 4).  However, in December, 2004, the FTC sent a letter

8  to Green Fiber warning that averaging the insulation depths to determine R-Values violates

9  FTC regulations (Mot. at 5, citing (Yarbrough Decl., Ex. 3)), which defendant argues

10  "shows no signs of ever having been provided to Fleetwood or any of the home

11  manufacturers."  (Opp. at 6).  The letter stated that FTC rules require "the installation of

12  loose-fill insulation at or above the required minimum settled thickness at every location"

13  and that the "minimum thickness labeling requirement . . . [does not] provide[] loose-fill

14  installers with the discretion to leave some areas at less than minimum settled thickness

15  and then average the overall thickness as a means to yield the appropriate R-Value."

16  (Mot. at 5, citing (Yarbrough Decl., Ex. 3 at 1)).  Nonetheless, plaintiffs allege that

17  Fleetwood continued to instruct its subsidiaries to install insulation utilizing the

18  aforementioned defective calculations.  (Mot. at 5).  Based on this wrong formula, plaintiffs

19  allege that "Fleetwood has systematically manufactured and sold homes for many years

20  that do not have the required insulation depth to achieve the represented R-Value."  (Mot.

21  at 5, citing (Yarbrough Decl. at ¶¶ 5-11)).

22         As evidence of the miscalculation and uniformity of the defect, plaintiffs present the

23  declaration of David W. Yarbrough, PhD, PE, who "measured the depth of insulation

24  installed in the attics of the units of [named class representatives.  He] did so by both a

25  visual inspection of the roof cavities of these units and by comparing the insulation levels

26  in those cavities to the attic rulers that are displayed on the interior of the units and stapled

27

3

1   to the attic trusses.  [He] also measured the depths of the insulation in various locations of
2   the attics that were accessible through the attic vents."  (Yarbrough Decl. at ¶ 5).  For
3   example, after inspecting the unit of plaintiff Jesse Browder, Yarbrough determined the unit
4   "had observable levels of insulation in the attic of 4.5 inches at one location, and in a
5   second location the insulation thickness varied from 2 to 4 inches and some locations had
6   no insulation.  According to the FTC disclosures provided by Fleetwood, the represented
7   R-Value in the attic for this unit is R-14 and the represented insulation thickness is 4.5
8   inches.  Based on the insulation in the attic cavity, the R-Value in Ms. Browder's home is
9   only R-11.2.  This unit does not have the R-Value represented."  (Yarbrough Decl. ¶ 6).
10   Having conducted similar inspections of named plaintiffs' units, plaintiffs assert, through
11   Yarbrough's findings, that "[n]one of plaintiffs' homes," despite having been manufactured
12   at different plants, "meet the represented R-Values."  (Mot. at 5, citing (Yarbrough Decl. at
13   ¶¶ 5-11)).

14       As counter-evidence, defendant presents the declaration of Stephen Bailey, the
15   Service Manager for Plant 75 in Alma, Georgia.  Bailey claims that "[w]hile some of
16   [Yarbrough's] statements contained in the declaration appear to be correct, others are
17   demonstrably incorrect . . . ."  (Bailey Decl. at ¶ 6).  For example, Bailey states that, after
18   having assessed the unit of Jesse Browder, it "was a particularly difficult unit to document
19   because the vents were . . . extremely small and difficult to access.  However, we again
20   took photographs . . . and, contrary to Mr. Yarbrough's representations, found absolutely
21   no voids.  There were several areas that, upon first inspection, may have appeared to be
22   voids but were, in reality, sections where there were pieces of OSB (oriented strand board)
23   lying on top of the insulation . . . ."  (Bailey Decl. ¶ 18).  Thus, Bailey contends that "the
24   measurements [taken] immediately under the vents . . . ranged from 3.50 to 4.50 inches.
25   What I observed but could not measure at the time appeared to be approximately 6 inches
26   in depth.  [Thus,] the unit appears to have a uniform minimum depth of insulation equal to
27

4

1   or greater than 4.50 inches represented, with some areas well in excess of that." (Bailey

2   Decl. ¶ 18).  Therefore, defendant uses Bailey's declaration as evidence that plaintiffs'

3   homes "were virtually all in compliance with the applicable government regulations" since

4   Bailey's inspection of the units showed a minimum depth of insulation fill in the units "in

5   excess" of the represented R-Value (Bailey Decl. at ¶ 15).

6        Defendant also argues that plaintiffs' reliance on the FTC correspondence letter of

7   December, 2000, fails to establish any misfeasance on the part of Fleetwood since

8   "nowhere is there any evidence" that the FTC regulates the calculation of R-Values.

9   (Surreply at 8).  Rather, defendant argues the FTC only "requires the units be labeled with

10  unit R-Values." (Id.)  Thus, defendant contends that "[t]here is no indication that the

11  opinions set forth in the December 2000 correspondence [between the FTC and Green

12  Fiber] are controlling or were ever implemented." (Opp. at 6).  On the contrary, defendant

13  says all of the calculations made by Fleetwood utilized to determine the appropriate depth

14  of insulation for the R-Value required are approved by the U.S. Dept. of Housing and

15  Urban Development ("HUD") (Opp. at 5) (citations omitted), which "regulates the depth

16  calculations for achieving stated R-Values and specifically approves a two-inch variance in

17  application." (Surreply at 7-8).  "Using these approved calculations, [Fleetwood] then

18  generates insulation fill drawings for the individual units ("DAPIA drawings"), setting forth

19  the R-Values and insulation depth requirements for each type of home being constructed."

20  (Opp. at 5).  These drawings are then "federally approved by the Design Approval Primary

21  Inspection Agency ("DAPIA")". (Id.)  Thus, defendant contends its policies and practices

22  are specifically DAPIA/HUD approved.  (Surreply at 3).

23       Defendant also uses Bailey's declaration in response to plaintiffs' reply brief, which

24  argued that "even if the two-inch variance is appropriate, the subject homes are still

25  defective because Bailey's own inspection of the units showed "variance" to be, in places,

26  greater than two-inches and thus Bailey "could not confirm *any of the homes* met the

27

1   represented R-Values and/or found a greater than 2-inch variance in the insulation levels

2   in every home" (Reply at 2).  Defendant contends that when Bailey used the word

3   "variance," he was "referring to amounts of insulation over and above the minimum level

4   observed."  (Surreply at 2-3).  Therefore, defendant uses Bailey's declaration as evidence

5   that "all but the White home fully comply with the insulation requirements once the HUD-

6   approved 2-inch variance is incorporated into the analysis."  (Surreply at 5).

7   **II. Claims Asserted**

8          Plaintiffs filed suit on September 17, 2007 alleging claims under California's Unfair

9   Competition Law (Cal. Bus. & Prof. Code §§ 17200 and 17500 et seq.) ("UCL"), the

10  Consumers Legal Remedies Act (Cal. Civ. Code §§ 1750 et seq.) ("CLRA"), breach of

11  warranty and contract, suppression, and unjust enrichment against Fleetwood Enterprises,

12  Inc.

13         On April 22, 2008, named plaintiffs in this action moved to certify a Class as follows:

14

15         "All persons in the United States who, at any time since January 1,

16         1999, purchased a home manufactured by Fleetwood Enterprises,

17         Inc., or any of its wholly owned subsidiaries, which contained blown

18         insulation in the attic in which the R-Value of that insulation is less that

19         what was represented by Fleetwood Enterprises, Inc.  Excluded from

20         the Class are the employees, agents, officers, and directors of

21         Fleetwood Enterprises, Inc., or any of its wholly-owned subsidiaries,

22         and Judge and his/her relatives back to the 2nd degree of affinity, and

23         counsel for plaintiffs and the Class."  (Mot. at 1).

24  **III. Standards for Class Certification**

25         To certify a class, plaintiffs bear the burden of proving that: "(1) the class is so

26  numerous that joinder of all members is impracticable; (2) there are questions of law and

27

6

1    fact common to the class; (3) the claims or defenses of the representative parties are

2    typical of the claims or defenses of the class; and (4) the representative parties will fairly

3    and adequately protect the interests of the class."  Fed. R. Civ. P. § 23(a).  Moreover,

4    plaintiff must also prove that at least one of the following conditions are satisfied: (1) the

5    prosecution of separate actions would create a risk of: (a) inconsistent or varying

6    adjudications or (b) individual adjudications dispositive of the interests of other members

7    not a party to those adjudications; (2) the party opposing the class has acted or refused to

8    act on grounds generally applicable to the class; or (3) the questions of law or fact

9    common to the members of the class predominate over any questions affecting only

10   individual members, and a class action is superior to other available methods for the fair

11   and efficient adjudication of the controversy.  See Fed. R. Civ. P. § 23(b); Dukes v. Wal-

12   Mart, Inc., 509 F.3d 1168, 1176 (9th Cir. 2007); Zinser v. Accufix Research Inst., Inc., 253,

13   F.3d 1180, 1186, amended, 273 F.3d 1266 (9th Cir. 2001).

14           In determining whether a class action is proper, "a court must assess a proposed

15   class definition in light of the facts of that particular case.  No fixed or abstract test of

16   sufficiency is possible."  James Wm. Moore, Moore's Federal Practice, Vol. 5 § 23.21[4].

17   Because of this, district courts are provided wide discretion under Rule 23 to certify a

18   class.  Califano v. Yamasaki, 442 U.S. 682, 683 (1979); Gunnells v. Healthplan Servs.,

19   Inc., 348 F.3d 417, 424 (4th Cir. 2003).  A class may be certified, however, only if the court

20   is "satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been

21   satisfied."  Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982).

22                                          **IV. Analysis**

23           Defendant raises several arguments in opposition to plaintiffs' motion:  Plaintiffs use

24   a flawed class definition; commonality is unsatisfied; predominance of "common issues" is

25   unsatisfied; the action is inequitable; Fleetwood is not liable for the acts of its subsidiaries;

26   and California law should not control because this is not a California centered action.

27

                                                7

1  (Opp. at i).  Defendant also challenges the merits of plaintiffs' claim that defendant violated

2  FTC regulations governing insulation requirements (as specified in the correspondence

3  between the FTC and Green Fiber).  (Surreply at 8).

4       Although couched as separate arguments, the common thread through all of them

5  is that the source of the wrongful conduct, if any, is to be found at the manufacturing level

6  where the multitude of variables that enter the process of building a home (be it the

7  particular plant where it is built, the size of the home, its roof configuration, etc.) make the

8  present case unamenable to class-wide adjudication.  Simply put, it is argued that

9  plaintiffs' claims are rife with individual issues that must be confronted in order to establish

10  liability.  The Court finds that plaintiffs' factual allegations, however, reveal this not to be

11  the case.  Plaintiffs allege that Fleetwood, from its corporate headquarters in California,

12  has continually instructed its manufacturing subsidiaries to employ a uniform defect that

13  affects the insulation value of all homes produced.  (Mot. at 1-2).  This defect --- an

14  instruction to its manufacturing subsidiaries to install insulation with a standard deviation of

15  two inches (and permitting up to a two-inch deviation from the minimum required depth or

16  thickness necessary to achieve the represented R-Value so long as the average overall

17  thickness of the insulation equaled the minimum thickness necessary to achieve the

18  represented R-Value) ---  has allegedly resulted in a continual and uniform miscalculation

19  and misrepresentation of R-Values to purchasers of Fleetwood homes.  (Mot. at 3-4).

20       Defendant counters that, even under this single source theory, "[t]o determine

21  whether a specific unit is even a potential class member - i.e., whether it contains

22  insulation 'less than what was represented' - destructive testing/investigation must be done

23  on an underlined individualized basis.  (Opp. at 3, citing (Bailey Decl. 7:1--19; Farish Decl. 6:9-12)).

24  Toward that end, defendant argues that a predominance of common issues is unsatisfied

25  (Rule 23(b)(3)) because "[a]ny 'misrepresented insulation depth' class, national or

26  California based, would suffer from numerous individual issues, and defenses, all of which

27

1   must be determined on an individual basis."  (Opp. at 9).  In essence, they argue that even

2   under the alleged defective instruction, some homes have insulation that did meet the

3   represented R-Values (meaning sometimes the represented R-Value was achieved

4   despite the two-inch deviation practice).

5        While this may be the case, plaintiffs have produced evidence to suggest that such

6   instances are rare.  For instance, the evidence submitted by Mr. Yarbrough would appear

7   to show that the defect is uniform and widespread, thus suggesting it would be

8   inappropriate to conclude individual issues predominate over the common questions raised

9   by defendant's uniform instruction method.  Furthermore, defendant's argument fails since

10  "[t]he amount of damages is invariably an individual question and does not defeat class

11  action treatment."  <u>Blackie v. Barrack</u>, 524 F.2d 891, 905 (9th Cir. 1975).[1]  Plaintiffs allege

12  that each individual unit would only require an individualized assessment to determine

13  whether or not a potential class member has "less insulation than what was represented

14  by Fleetwood," which relates to the amount of damages that each unit may be awarded.

15  (Mot. at 22).  Plaintiffs also allege that the damages may be calculated using a common

16  formula.  (<u>Id.</u>)

17       The Court therefore finds that common issues predominate and that plaintiffs'

18  claims do not raise "individual issues" so as to preclude class certification.  The common

19  question applicable to the entire class is whether Fleetwood is liable for applying a uniform

20  flawed method of installing blown insulation and the extent to which that would lead to

21  lower R-Values and be inconsistent with federal regulations.  (Mot. at 9).  Plaintiffs allege

22  that they "will show that all of the Class members entered into a contract whereby

23  Fleetwood made the same express or implied promise--to provide homes with the R-Value

24

25       [1]  Furthermore, Fleetwood has failed to show that there exist individual issues,
    despite the argument that each home is different in size, design, type of insulation, and R-
26  Value specifications because those questions ignore the single source theory proffered by
    the plaintiffs--that the sole source for the R-Value defect lies within the instruction
27  Fleetwood sent to its subsidiaries.  (Opp. at 2).

1   of insulation consistent with its FTC R-Value disclosures and with the federal regulations--

2   in exchange for valuable consideration.  Plaintiffs will further demonstrate that Fleetwood

3   breached this contract by failing to provide the R-Value of insulation set forth in its required

4   FTC disclosures because of its uniform failure to properly install insulation or calculate R-

5   Values."  (Mot. at 20).  Plaintiffs also allege that under its causes of action, plaintiffs' claims

6   are completely focused on Fleetwood's conduct rather than any Class member's unique

7   attributes.  (Mot. at 18).  For instance, "[w]hether Fleetwood's conduct was unlawful,

8   fraudulent, or unfair will not be decided based on acts peculiar to each Class member but

9   based on a single set of facts applicable to all since knowledge of the wrongful conduct is

10  not relevant under the UCL."  (Mot. at 18) (citation omitted).  "The common questions

11  under the CLRA include whether Fleetwood uniformly miscalculated the R-Value of the

12  insulation in its homes, whether it misrepresented in its disclosure statements or concealed

13  the R-Value was not as disclosed and that its homes were not in compliance with HUD

14  Code standards, and thus not legally saleable, and whether these facts were material."

15  (Mot. at 19).

16      Thus, if plaintiffs' allegations were found to be meritorious, Fleetwood, the corporate

17  parent in California, and not its manufacturing subsidiaries, would be liable for its defective

18  instruction that is common to all homes created by Fleetwood subsidiaries.  Therefore, the

19  Court finds that plaintiffs have satisfied each of the four elements of Rule 23(a)--

20  numerosity (potentially affected members exceed 140,000), commonality (common issue

21  of Fleetwood's conduct in using a defective instruction), typicality (same defect that would

22  affect all class members), and adequacy of representation (named plaintiffs allege same

23  defect that would affect the entire class), and at least one element of Rule 23(b)--namely,

24  that the questions of law or fact common to the members of the class predominate over

25  any questions affecting only individual members and a class action is superior to other

26  available methods for the fair and efficient adjudication of the controversy.  This last point

27

10

1  is satisfied because the common issue of Fleetwood's defective instruction is the central

2  issue of plaintiffs' case, and, for purposes of judicial economy, a centralized (class

3  certification) adjudication is more efficient to handle such claims than separate

4  adjudications, given that the alleged wrong in each of those cases would be the same

5  conduct.

6       Lastly, the Court, in deciding a motion for class certification, will not entertain

7  defendant's arguments against the merits of plaintiffs' claims relating to FTC regulations.

8  The U.S. Supreme Court has explained that, "[i]n determining the propriety of a class

9  action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or

10  will prevail on the merits, but rather whether the requirements of Rule 23 have been met."

11  Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974).  Therefore, it is not for the Court

12  to decide at this stage whether plaintiffs have stated a claim or whether plaintiffs' basic

13  claim is meritorious, especially when the disputed evidence is unnecessary in deciding

14  whether the requirements of Rule 23 are met.  Here, the presence of rivaling expert

15  witnesses only serves to underscore this point.

16       On a final note, going forward, the Court will be mindful that a "district court has the

17  power at any time before final judgment to revoke or alter class certification if it appears

18  that the suit cannot proceed consistent with the requirements of Rule 23."  Fed. R. Civ. P.

19  23(c)(1); Walsh v. City of Detroit, 412 F.2d 226, 227 (6th Cir. 1969).

20       That said, the Court **GRANTS** plaintiffs motion for class certification.

22  Dated:  September 4, 2008

24       STEPHEN G. LARSON

25       UNITED STATES DISTRICT JUDGE